Number 191123, United States v. Jose Antonio Hernandez-Hernandez. Good morning, Your Honors. Members of the Court, Attorney Rafael Castellan, representing Appellant Jose Hernandez-Hernandez, I would like to request four minutes for rebuttal. Four minutes, okay. Thank you, Your Honor. I would like to concentrate on the erroneous application of the organizer enhancement in this case, which caused a six-level upward enhancement. The case law is clear that in order for you to be an organizer, you must have control, organized or managed actors, not activities. And the record in this case fails to establish who Hernandez controlled or managed. In terms of the conspiracy, he was at the bottom of the totem pole. When you say that, my understanding is there's at least two circumstances in which it suggests that he did. One is in the car when someone leaves the car to get the keys, right? That's one example the government emphasizes a circumstance where given what transpired about who left the car, the only way to understand that is that he was giving direction to the other person in the car as to what to do. Well, Your Honor, in terms of the cars, he arrived in a Honda with a co-defendant that was dismissed. Dimas, who was in the Mazda, arrived with the $55,000. And behind Dimas there was a Lexus where El Ciego and another person by the name of Kelvin were there armed. The Ford, the Ford, Hernandez did not take control of the Ford where the drugs were. It's quite the contrary. What the PSR states clearly in the record reflects is that Dimas was the person that boarded the Ford. Hernandez may have been told because Hernandez was remember that Hernandez was the contact person. They were not going to talk to Dimas because Dimas showed up that day for the first time. So the fact that the agents may have mentioned to Hernandez where the keys are is of no significance. What is more important is that the person that went and got the keys, boarded the Ford with the drugs, was Dimas. And that is also in fact... How did he know to do that? What? How did he know to do that? Well, obviously, well, Dimas picked up Hernandez in the Mazda. Yeah. And they then went together to the urban train station. And that's... Just to help... There had been a communication... Just let me finish the question. Just to help me so I understand. I thought the government's theory in essence is, as you say, the agents are in contact with your client. Right. Yet other people then seem to be doing things that the agents have not been in contact with. So how do they know to do them? The theory is, as I understand the government's case, they know to do them because your client is telling them to do those things. No. In fact, what the government... That's the problem with the government's brief and argument. They distort the record, Your Honor. The record... What the record reflects, and this is clear, again, we have to go to the record. And here the text messages are crucial between Looney Tunes, who's the undercover, and Hernandez. These are highly reliable because these were text messages that were... They were planning, talking about the offense conduct. And what those text messages clearly reflect is that Hernandez was following orders, number one. And number two, that Hernandez's mission was to deliver the drugs that arrived. And what's going on is that Hernandez was the person whom Calvin and Ciego would communicate with, and the agents would impart orders to Hernandez. Okay? And, in fact, if you look at the record... I just want to understand how the sentencing hearing itself played out. My understanding is that the sentencing hearing consisted largely of your client testifying and tried to minimize his role. The government did not put on the agents or other participants in this event. Is that correct? It was largely your client testifying? Well, it's partly. Is that correct? The government presented no evidence except in a motion. They included some of the text messages. Okay. Hernandez presented a substantial amount of text messages. So he testified? Yes, he testified. Let me just... So he test... So that... There's a strong suggestion more than that in the way in which the court then analyzes. The court simply did not believe, did not believe your client in his attempt to minimize his role. Instead, he seems to have drawn the kind of inferences that Judge Barron is describing. Why couldn't the judge do that? Hear your client and say, I don't buy any of this. I don't buy this minimization of his role. Well, the minimization, I believe, is related with his denial of being an organizer. That is what the judge rejected. Right. And I submit that if we look at the record, those findings are clearly erroneous, because this is not a mere case where a defendant testifies and the judge measures his credibility. If that were the case, I would agree with you. Here we have text messages. So I take that point, that he was clearly being told by the agents to do things. Yes. And in receiving those instructions, he's not an organizer simply by receiving them and acting on them. Of course. Okay. So what the government's theory of the case as reflected in the district court's finding, and I think this is what we're asking you to address, is even though you're right as a legal matter on that point, if the record could be read to show that in addition to receiving orders and acting on them, he was given discretionary authority as to how to implement the scheme, and that he then exercised that discretion by passing on orders of his own or instructions of his own to others, wouldn't that make him an organizer? And I don't hear you saying as a legal matter that's wrong. You're just saying as a factual matter there's no support for that, right? If the facts would reflect that, I would agree with you. Okay. So getting to the facts of that. I'll give you one example if I may. For example, the government says, oh, Hernandez on his own negotiated downward from $5,000 to $4,000 the fuel cost. The text messages reflect the opposite. When they talk about the $5,000, Hernandez tells the agent, my people say they only have available four. So it's not that Hernandez, as the government claims, took over and negotiated on his own. He obviously had already spoken with the true organizers and owners, and they had informed him they only had four. And that's what the text messages say. He said, my people say they only have four. But that's bad for you. It's not bad for me. That's Hernandez saying that he spoke with other people other than the agent and found out what price they would get. They are the ones that are informing him what he can do. The people that paid, the $4,000 weren't Hernandez. Someone gave him the $4,000. And obviously, since this is a transportation case, there had to be some payment of fuel. So your point, and then the response to that, there's no negotiation, as the government suggests. The response to that is, I guess, that's enough. That's all you've got. That's enough. Correct. You're entirely correct. And that's the problem with the government's brief. Okay, now this is helpful in hearing your argument on the factual point. With respect to the claim that he was giving instructions when he instructed his co-defendant to retrieve the car keys from the van. Right. Could you just walk through that? What's your response to the government's account of that? Because the government's account there is that he was exercising discretion to direct some of the other members of how to implement the scheme by go get the keys from the van and drive the van away. That's a completely false, misleading statement. Because Hernandez was the contact person. So he received instructions from the agents, and he would receive instructions. From the people. But when he arrives at the urban train station, he is the one that's told where the keys are. And obviously, since he is not the owner, and he is not the person that's going to do the actual delivery, he tells DEMA, DEMA, I'm told where the keys are. And then DEMA goes and retrieves the keys and gets on the Ford where the drugs are. And all of this reflects that all Hernandez does is convey information that the agents give him. He wasn't exercising discretion. Let me just ask the question. He wasn't told by the agent whom to involve in getting the keys. Correct? Well, he was provided a substantial amount of radios, coordinates. Practically the whole C intervention was controlled by the agents. The agents were the ones that said that he had to be paid $60,000. The agents were the ones that selected the place. All of these were orders that he followed given by the agents. Obviously, the agents didn't know about DEMA. Hernandez meets DEMA. When he picks him up, it's the master. And it's obvious that Hernandez was aware that the person that was going to get in that Ford and take the drugs was DEMA. And that's why he conveys he's not exercising discretion. DEMA was the one that was already in place to take the drugs on the Ford. Thank you. Okay. Thank you. Good morning, Your Honors, and may it please the Court. Greg Conner for the government. I also want to focus on the role enhancement issue because it implicates the other issues raised on appeal as well. The district court in this case did not clearly err in applying the role enhancement. And because the other arguments fail, this Court should affirm Hernandez's sentence. Now, this Court addresses role enhancements for a leader organizer in two parts, in a scope determination and a status determination. But in this Court's decision in Carrera-Hernandez, it explained that it doesn't have to address the scope determination when it's not contested. Here, the numerosity factor was not contested below. It's not contested on appeal. So whichever member of the panel writes this opinion, I think, can address scope the same way it did in Carrera-Hernandez. So turning to the status part of the analysis, I want to first address an issue that came up in the briefing because for the first time in his reply brief, Hernandez offers the Court a new rule from the Tenth Circuit. And this is the rule from the Litchford case. And that rule pretty much says that the government has to demonstrate the organizing or leading of each and every member of the conspiracy. I'm not going to waste too much time on this, but briefly, this Court should not follow Litchford because it's out of circuit, out of date, raised for the first time in the reply brief, and most importantly, in direct conflict with this Court's rule, which Hernandez and the government were in agreement about in the opening brief and the government's response brief. So the rule, as far as status, is that the government had to show organizational control over one participant. Now, despite the fact that... I'm sorry, over what? What did you just say? Over what? One participant. As opposed to all. Exactly, Your Honor. Now, despite the fact that I don't think the Litchfield rule should apply, I don't think this Court should... It's enough if there's just one single instance of telling somebody to do something? That's all that's required? I'm not arguing that that's all that's required, and I think it would be a tougher case if that was what happened. But in this case, and if I can finish my statement, I do think the government showed organization of the entire conspiracy, the activity, and all of its participants. I think the record does show that. Well, how could you show of all of the participants without showing some instance in which he exercised direction over each participant? Because, Your Honor, we have unobjected to facts from the PSR, and those facts mirror, they're just about word for word, the factual narrative of the plea agreement for Giardino and for De Morla. So all of the co-defendants in this case agree to the same basic facts. A big one, which is in, I believe, paragraph 15 of the PSR, and the corresponding paragraph in the plea agreement, is that this was a conspiracy, quote, for Hernandez. And there are a few other key facts in the PSR that demonstrate this sort of organizational control. So first, it was Hernandez that contacted the cooperating defendant and recruited him. Now, that's not direct evidence, I'll address that in a minute, but that is part of the, it goes to the heart of Hernandez's control over this conspiracy. So all of the members of the conspiracy agree that it was Hernandez's conspiracy and that Hernandez made a series of agreements on behalf of his group. It wasn't just the fuel. It started with the original price of drugs, $200,000 for 200 kilograms. He had that decision-making authority on behalf of his group. He then did agree to the $4,000 price. I'm confused. The counterargument is that the person who was organizing it was Looney Tunes, that that person is setting all of the direction, and that Hernandez is just following the directions of that organizer. So what's wrong with that contention? Well, two points, Your Honor, a factual and a legal point. The first is that even if Hernandez can convince this court that there is an equally plausible view of the record, this court said in Carrero and several other cases that when the district court selects among multiple plausible views, it's not clear error for the district court to adopt one of those plausible views. So that's why I'm discussing these facts in the context of why the sentencing judge's view was plausible. And in this case, yes, Hernandez takes input from the cooperating defendant or from the undercover agents, but he also gives input. For example, suggesting places offshore, he says, you know, don't go to Manatee, maybe Toa Alta, maybe offshore different cities in Puerto Rico. So there is an exchange, but he's also providing input. And as much as – With respect to directing other members, that's planning activities. Which is a fact – yes, sorry, continue. So you – do you have any – what is your account of how the district court was correct to suggest that there was sufficient evidence to support the finding that he organized other participants as opposed to other activities? What are the instances in which we can see him organizing some other participant? Because I think if you don't have any of that, that's obviously a challenge. Of course. So if you have one instance of it, then maybe we look at contextually with all the other things you're talking about. We need at least one instance to get going. So what's one, and is there more than one, and what's the account you would give in response to what you've heard as to why there is no such basis for that? Okay, I'll give at least three definite instances. First, an – and this is in the PSR and the plea agreements. An individual from the Dominican Republic contacts the cooperating defendant. When he contacts the cooperating defendant, he says – and this is like the first paragraph of the factual narrative – this is a conspiracy for Hernandez. That is the individual in the Dominican Republic recognizing the organizational authority of Hernandez. So that's one. The second is that he made three agreements on behalf of his group. That is binding – that is showing the organizing by negotiating on behalf of his group. What three agreements? The three agreements are the original price of drugs, and it wasn't that – sorry if I interrupted – but it wasn't that the – that he was acting on behalf of Looney Tunes, because he contacts Looney Tunes and tries to set up the price for drugs. He is initiating that – this deal. And you're basing that on the text messages? No, I'm not basing that on the text messages. What's the evidence that supports your account of his relationship to Looney Tunes with respect to the setting of the price? The unobjected two portions of the PSR and the plea agreements, which every co-defendant agrees to the same narrative. And in the second paragraph of the narrative of the PSR, the PSR states that Hernandez contacted the cooperating defendant who was working with the undercovers. So he makes three agreements regarding the original price, the fuel price, and then – Who set the price? Where did that come from? Who set the price? $200,000. Right. Who set that price? That information is not in the record, but there – Just the fact that Hernandez may be aware of it, I mean that's entirely consistent with the defense theory that he's just an intermediary. The fact that he has information doesn't by itself suggest that he is an organizer within the meaning of that phrase. Just to follow up on your theory, any low-level person who stays in the conspiracy and does what they're told is agreeing to the terms of the conspiracy, and then you treat them as a negotiator in it. That doesn't seem to make a lot of sense. No, and I'm arguing not that he was merely an intermediary and not that it's clear from the record. I don't think it's clear from the record who exactly set the price. Was there any indication that if he had objected to that number it would have changed? That he had the power to set a different price than the $200,000? That information is not in the record other than – Put that aside. Do you have anything else besides the setting of the $200,000? What are the other two agreements? The other two agreements are the price of fuel, and really briefly, as much as Hernandez objects to the characterization that it was his agreement, he didn't object to the portion of the PSR that says it was his agreement. The exact wording is, Hernandez agreed to the $4,000 price. So it was plausible for the district court viewing that unobjected portion of the PSR and the text messages. The whole purpose of his testimony at the sentencing hearing was to refute what's in the PSR. Are you saying that it was too late for him to do that? Is that your position? Are you saying that when he took the stand at the sentencing hearing and described his role, as he sees it he's nothing more than an intermediary, he is challenging those characterizations in the PSR that would make him an organizer. He can't do that? It's too late to do that? Is that your position? My position is a little different. But, yes, essentially he needed, I don't think he was specifically trying to object to the PSR. I think he was trying to minimize his role. But the PSR does implicate him, and he and Gerardino and De Morla all agreed to that factual narrative. Counsel, why are we in this position at all? How is it that the government, given the importance of this organizer determination resulting in the six-point enhancement, how is it that the government, other than text message, put on no case in order to support this determination? It seems a very odd choice. Perhaps, Your Honor. There's no information in the record to indicate the government's strategy other than it apparently I'm not sure that's entirely correct because if you look at page 113 of the appendix, there's a specific finding by the district court as to what the basis for this organizer finding is. And he says the court finds persuasive that the government included in its description analysis at docket number 208. Where do we find docket number 208 in the appendix? Is it there? Because that seems to be what the district court is finding. Yes, that's the sentencing memorandum, and that addresses all of the facts. That's the sentencing memorandum in the appendix. I apologize, Your Honor. It's the government's response to defendants' objections. And where is that? And that is, it starts at 245 of the appendix. Where does that consist of? It addresses the facts that every defendant But it's based on what? Is it just referring back to the PSR? It's referring to the PSR. It is the first time the text messages come in, and In the government's case, it's the text messages plus the PSR, what you call the unobjected to PSR. Is there some other? Yes, because after the government submitted its memoranda, he testified. So the government was also able to argue that he wasn't credible and that his statements were inconsistent with the unobjected to portions of the PSR. What we are supposed to look to to find out if there is record support for the finding that he's an organizer, in your view, is the PSR's account plus the text messages. And the contrary account given by the defendant at the hearing, you would say as long as it's possible not to believe him, then you default to the account that's given in the PSR and the text messages. And if those contain enough evidence to support an organizer finding, then we should uphold it. That's what you're asking us to do. With one addition, Your Honor, I think it's important that it's the same sentencing judge that received and was aware of the plea agreement by De Morla, by Gerardino, that agreed to the same factual narrative. Now, Judge Barron, you mentioned the instructions in the car, the cash for drugs exchange. I want to highlight some key points about that because, one, this undermines the sworn statement, which is problematic for that sworn statement, but it undermines the sworn statement that Gerardino provided that he was acting on somebody else's orders instead of Hernandez's orders. That was a last-minute instruction only to Hernandez that only Hernandez was aware of. Again, this is from the PSR. And what's important about that is Gerardino came in his, if I may finish briefly, Gerardino came in his own Mazda. So Hernandez had to not only instruct him to board the other vehicle, he had to instruct him to give up his own vehicle. At the time, it was unclear when or if he would ever get his Mazda back. Recognizing that authority, plus the remaining factual allegations from the PSR, is enough to show organizational control. Counsel, I'd like to ask you very quickly about co-defendant Kelvin. I gather it was the appellant's account at the sentencing hearing that Kelvin was really the leader and organizer of this effort. Is that correct? And to that end, he testified that Kelvin, subsequent to the plea in this case, pled guilty to money laundering and importing a huge amount of cocaine. Is that correct? Did he so testify to that, said that Kelvin was really the organizer and then presents evidence suggesting that in another transaction, he subsequently did plead guilty to money laundering and importing a huge amount of cocaine. Is that correct? Did he so testify? I'll correct slightly. That partly comes from his lawyer's account. His lawyer is the one who suggested the exact amount that Kelvin had been, excuse me, DeMorla had been busted for. But I think what's important about that is two points. One, even if he's alleging that DeMorla was, quote, the real boss, under this court's decision in Tejada Beltran and under the Ninth Circuit decision in Doe, even if that's the case and DeMorla was the real boss or anything like that, that's not enough for Hernandez to win on this appeal. This court explained that for purposes of the organizer characterization, you can be deemed an organizer and be outranked in the criminal hierarchy. The important factors for an organization, for an organizer determination, are the factors in Application Note 4 that I've discussed, such as negotiating, decision-making authority. Sorry, go ahead. Before you, Santana, I just want to ask you about the quantity issue from 200 to 60. Just help us. I'm having trouble understanding how I'm supposed to think about that question. So the actual amount is 60? That was what was actually delivered? Yes, Your Honor. And the agreed amount was 200? Yes, Your Honor. So how in this circumstance would it make sense to say that he's responsible for the 200? Is it important that we think that he had some ability to set the amount? Or if I were to conclude on this record I have no basis for thinking he had any ability to set the amount, then what would be the basis for thinking that I should go with the 200 number rather than the 60 number, given that one plausible reading of this is they were going to tell him an amount. He had no capacity to change that amount. Whatever that amount turned out to be, he would do. So why should he be held to 200 if they only had 60? I think my answer to your question can be relatively short. Ultimately, the district court held him responsible for 60. The district court, in a sort of roundabout way, determined that the original agreement was for 200 and at least started his analysis by holding him liable for 200, but ultimately decided to sentence him according to the lower amount. And you would say there's no basis in the record for thinking that if he had started at 60, he would have gone lower than that? There is no basis in the record for that. Okay. Thank you, Your Honors. Your Honor, interestingly, I haven't heard one name whom Hernandez acted as the managed or coordinated, not one name. The government distorts the record. It claims that the PSR and the plea agreements state that Hernandez was the leader of the conspiracy. That's not true. I have at page 6 of the PSR, paragraph 15, and the plea agreement and the appendix 182, they state the same thing. And what they state is the following. That on April 9th, some individual whom we don't know who is, contacted a cooperating defendant in Puerto Rico and requested his assistance in order to coordinate a maritime drug smuggling venture for an individual identified as Jose Antonio Hernandez. It did not state that Hernandez was the organizer. It did not state that Hernandez was the owner. In fact, the record reflects otherwise. The text, let's forget about Hernandez' testimony. The text revealed that that is not true. All that was said is that there was going to be a venture involving Hernandez. And obviously, if Hernandez. What's the significance of the phrase for Hernandez? For an individual in a venture. A venture for an individual. Since Hernandez is the contact man in Puerto Rico, obviously, that's the name you're going to give. It doesn't mean, nor can that sentence be interpreted as saying Hernandez is the leader, the owner of the drugs. No, he is a participant in the venture in Puerto Rico. Okay? The venture. So I believe that the government has extrapolated the argument and really gave an interpretation that is not supported by that sentence. Counsel, I want to ask you about the text messages which you suggest all point in one direction, namely that your client was nothing more than an intermediary. The text messages include this exchange, which is very short, which I'd like to quote to you. This is your client speaking. He's speaking to Looney Tunes. Brother, I don't want you in trouble, but I was not to blame for this. If I had been told about this, I would not have even bothered myself with this. Looney Tunes, no, never would I say that to you. Appellant, I do want to see if you can do something for me in my backyard, but with my own real people. That, I would suggest, that statement lends itself to an interpretation that your client is involved in the drug trade with his own real people. It is separate. We have to deal with this conspiracy, not potential drug activity that's not object of the indictment. And, in fact, in this case, Your Honor, Hernandez was taken for a ride. This is important because the prosecutor emphasized the 200 kilos. If Hernandez really was controlling the amount of drugs sent, 200 kilos would have been on that boat, not 60 kilos. If there is a suggestion from these texts that your client is a player in the drug trade, it doesn't make it much more difficult to argue that in this transaction, he's nothing more than a low-level intermediary. That he's a player means that he participates in drug ventures. And what we have is this particular case, where this record where he was taken for a fool, misled because the real organizers mistrusted the transporters, and they wanted to make sure if they were reliable. They lied to Hernandez, told him there were 200 so that the transporters would accept that amount, and when the time came to send the drugs, they only sent 60 kilos. And after Looney Tunes objected to Hernandez and he said, I'm going to try to find out because what I was told is that you all didn't want to take the other amount because you had a problem with an engine, he then afterwards learned that he had been taken for a ride, that the owners, the two owners and organizers had had trouble before, and they were only going to send 60 kilos because if they let it be known that it was only 60, the transporters were not going to accept that drug transportation. So the whole situation about the 200 kilos is further evidence that he was not in control of what was going on. Thank you. Thank you, Honor.